STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


09-390


STATE OF LOUISIANA

VERSUS

ERNEST D. CAIN

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 290,950
HONORABLE THOMAS MARTIN YEAGER, PRESIDING
\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses G. Thibodeaux, Chief Judge, Sylvia R. Cooks, and John D. Saunders, Judges.

REVERSED.

Sheryl Laing, ADA
P.O. Box 1472
Alexandria, LA 71301
(318) 473-6650
COUNSEL FOR APPELLEE:
        State of Louisiana

Thomas Davenport
The Davenport Firm
1628 Metro Drive
Alexandria, LA 71301
(318) 445-9696
COUNSEL FOR DEFENDANT-APPELLANT:
        Ernest D. Cain

**COOKS, Judge.**

**FACTS AND PROCEDURAL HISTORY**

On February 17, 2008, Deputy Scotty Paul of the Rapides Parish Sheriff's Department drove out to the home of Wilton Friday to investigate Mr. Friday's complaint involving Defendant, Ernest D. Cain, his half brother. Mr. Friday reported that Defendant fired a gun earlier that day and the bullet grazed the trees near Mr. Friday's residence. On that date, Defendant resided in a tent located on the back five acres of the property, about eight hundred yards from Mr. Friday's residence.

When Deputy Paul drove up to Defendant's campsite to investigate Mr. Friday's complaint, Defendant stepped out from beside his truck and fired a shot in the air. Deputy Paul then arrested Defendant without incident.

Defendant was charged by bill of information with illegal use of a weapon, first offense, a violation of La.R.S. 14:94, for the shot fired in the air when Deputy Paul arrived. Following a jury trial, Defendant was found guilty as charged. Defendant was subsequently sentenced to serve two years at hard labor, suspended, and ordered to pay a fine of $500.00 and $241.50 in court costs by December 1, 2008. The default sentence for failure to pay the fine and costs by that date was six months in the parish jail. The trial court also ordered two years of supervised probation.

As a condition of probation, Defendant was not to be in possession of a firearm or ammunition during the two-year probation period. A monthly supervision fee of $60.00 was ordered and Defendant was ordered to submit to random drug testing, to abide by a curfew of 10:00 p.m. until 6:00 a.m., refrain from consuming alcoholic beverages and controlled dangerous substances, refrain from entering a bar, lounge or casino, reimburse the Public Defender $250.00 and attend and successfully

complete substance abuse treatment. Lastly, the trial court ordered the forfeiture and destruction of the weapon seized from Defendant.

Defendant did not make or file a motion to reconsider sentence. He is now before this court on appeal, asserting four assignments of error which challenge both his conviction and sentence. For the following reasons, we find Defendant's conviction and sentence should be reversed.

## ANALYSIS

Defendant argues the evidence is not sufficient to support his conviction. We will address this assignment of error first in the event the Defendant is entitled to an acquittal. *State v. Hearold*, 603 So.2d 731 (La.1992). "When the entirety of the evidence, including inadmissible evidence which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot." *Id*. at 734.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

-2-

The illegal use of a weapon is defined in La.R.S. 14:94 as the intentional or criminally negligent discharge of a firearm where it is foreseeable that it may result in death or great bodily harm to a human being. In the instant case, Defendant argues it was not foreseeable that the warning shot would or could result in death or great bodily harm to a human being. Further, Defendant maintains the uncontradicted evidence shows there was no death or great bodily harm and there was no showing made that firing in the air could have had such consequences. Lastly, Defendant contends the act of firing in the air, in itself, negates the inference or conclusion that he had no regard for consequences giving rise to general intent.

At trial, Wilton Dean Friday, testified Defendant, who was his half-brother, was living in a tent on the back five acres of property that the two men had inherited. Defendant's tent was located about eight hundred yards from Mr. Friday's house which was located on the front part of the property. On February 17, 2008, Mr. Friday called the Rapides Parish Sheriff's Department to investigate an alleged gunshot he heard shortly after he and his wife arrived home from the hospital. Deputy Scotty Paul was dispatched to the scene. Mr. Friday asked Deputy Paul to speak to Defendant, as he believed this was where the gunshot came from. Soon thereafter, Mr. Friday heard a shot and Deputy Paul returned with news that he had arrested Defendant.

On cross-examination, Mr. Friday maintained he was clear about what he heard that night although he was taking pain medication when he was released from the hospital. He was not sure, however, of the last time he had taken pain medication before he was discharged that day. Mr. Friday denied having a conversation with the Defendant on the morning of February 17, 2008, wherein he told Defendant he was

heavily medicated because of his surgery. On redirect, Mr. Friday testified that he did not take his pain medication on a regular basis and only took it as needed.

Deputy Paul testified that he investigated a report of gunshots on February 17, 2008. Mr. Friday advised him that Defendant was camped out in the pasture and he believed Defendant had fired a shot earlier. Deputy Paul then drove out to where Defendant's tent was set-up and as he approached the tent, Defendant stepped out from beside his truck with a black pistol in his hand, a Glock 9 millimeter, automatic, and fired one shot in the air. Deputy Paul exited his vehicle, drew his weapon and ordered the Defendant to put down the gun and lay down on the ground. Defendant immediately cooperated with Deputy Paul's order, was then handcuffed, patted down for weapons and placed in the unit.

According to Deputy Paul, Defendant appeared intoxicated. When he asked the Defendant if he had anything to drink, the Defendant stated that he was "drunk." Defendant had no explanation as to why he fired the shot and there was no one else around.

On cross-examination, Deputy Paul testified Defendant was facing toward Mr. Friday's house when he fired straight up into the air. Deputy Paul did not know where the bullet went from there. He was still in his unit when he saw the flash and did not hear the bullet hit anywhere. The bullet impact did not cause Deputy Paul to flinch or take cover.

Defendant testified that on February 17, 2008, he saw Mr. Friday at 10:00 a.m. with his arm in a sling. Defendant asked Mr. Friday what had happened and Mr. Friday reported that he had surgery. According to Defendant, Mr. Friday appeared heavily medicated. At about 8:00 p.m., Defendant was listening to the radio when a vehicle came through the gate that was supposed to be closed. He immediately

became alarmed when the vehicle proceeded through the gate without stopping to open the gate. When the vehicle was ten to fifteen feet from his truck, the Defendant noticed that it was a police car. Defendant initially stated that a shot was not fired at that time.

Defendant did admit to firing a shot at about 6:00 p.m. when his other half brother, Truman Friday, had approached the area. Defendant explained that Mr. Friday had asked him to help watch his property because people were stealing from him and shooting at his house, and at that time, he was not home. According to the Defendant, Truman pulled up to the gate, stopped his vehicle and sat there for about five minutes. Defendant was not aware that it was Truman, so when Truman did not get out of the vehicle or blow his horn, Defendant fired a warning shot in the air. Defendant maintained the shot did not impact Mr. Friday's house.

Defendant admitted he had been drinking alcoholic beverages that day and testified he was celebrating his graduation from a three-week, high plane-training course put on by the International Contractor's Association. Defendant stated he consumed a half-liter bottle of wine over approximately four to five hours.

On cross-examination, Defendant testified prior to firing the shot at 6:00 p.m., he was concerned that Mr. Friday was in the house and was unable to come to the door because he was "knocked out" by pain medication. Defendant reiterated that Mr. Friday had complained about people stealing from him and had asked Defendant several times to watch the place for vehicles and people. According to Defendant, he fired a shot to warn the intruder and to possibly wake up Mr. Friday. Defendant testified it was dark and there were no streetlights. The only illumination was from the front windows on Mr. Friday's porch, just enough light to see that a white vehicle had pulled up.

With regard to Deputy Paul's testimony that Defendant fired a shot upon his arrival, Defendant maintained that Deputy Paul was fabricating the truth or lying. Defendant asserted Mr. Friday and Deputy Paul were lifelong acquaintances and alleged the lie was a favor to Mr. Friday. Defendant also testified Mr. Friday fabricated the fact that Defendant fired a shot when he drove up.

Defendant also testified he was scared for his life because he did not know that it was a police car. Defendant maintained if Deputy Paul would have turned on the lights or PA system, he would have believed it was a police car. Defendant assumed someone had come to harm him considering it was private property with a history of trouble with drug dealers, informants and hunters. Although Defendant was afraid, he did not fire a shot, "[b]ecause you don't fire shots at people, and I had already fired one shot already as a warning."

On appeal, Defendant no longer denies he fired the weapon in the presence of Deputy Paul which was heard by Mr. Friday. Instead, Defendant challenges the foreseeability of his actions. Defendant contends it was not foreseeable that firing a shot in the air would or could result in death or great bodily harm to a person because there was no evidence that death or great bodily harm could result from his actions or that firing in the air could have resulted in death or great bodily harm. Lastly, Defendant contends the act of firing in the air, in itself, negates the inference or conclusion that he had no regard for consequences giving rise to general intent.

In *State v. Powell*, 95-424 (La.App. 3 Cir. 11/2/95), 664 So.2d 608, this court was faced with a similar situation. The defendant was charged under La.R.S. 14:94(E), which amongst other elements, the State had to prove that considering the time and place, it was foreseeable that death or great bodily harm might occur to another person. In *Powell*, the defendant drove by a residence and fired three to four

shots from a .25 semi-automatic pistol. At the time the pistol was fired, four adults and a few children were in and around the front yard of the residence. The shots, however, were aimed in a direction opposite that of the residence, and, thus, the court concluded that it was not foreseeable that death or great bodily harm might occur.

In *State v. Ordner*, 06-1054 (La.App. 3 Cir. 2/14/07), 951 So.2d 508, *writ denied*, 07-587 (La. 10/26/07), 966 So.2d 572, however, this court held it was foreseeable that discharge of a weapon, including shooting in the air, could result in death or great bodily harm. The defendant in *Ordner* was charged with illegal use of weapons and aggravated battery. On the evening in question, the defendant went to a party on a river where at least twenty-five to fifty young people were in attendance. The defendant had been drinking and brought a loaded gun to the party. Not long after his arrival, the defendant was approached by four men. In an attempt to stop a physical altercation, the defendant fired a shot in the air and the men took off running. The defendant, however, fired his gun two more times, even though the threat was over, striking and injuring a man who was trying to convince the defendant to put his weapon away and was never shown to have been a threat to the defendant. The court also observed that the State was required to show criminal negligence, not intent, for the illegal use of a weapon, and found the defendant was criminally negligent in firing the gun, regardless of his intention.

Like the defendant in *Ordner*, the Defendant was intoxicated, by his own admission, when he fired his weapon. However, unlike in *Ordner*, where the defendant there brought a loaded weapon to a party, Defendant in this case was on his own property, alone. Further, Defendant fired his gun only once and immediately cooperated with Deputy Paul after ascertaining he was a police officer. Ordner, after initially firing his gun once to stop an altercation, continued to fire his gun several

more times after the threat was over. Therefore, the *Ordner* case is factually distinguishable from the facts presented here.

Further, the record is void of evidence that one could foresee Defendant's actions could result in death or great bodily harm. According to Deputy Paul, there was no one else around. Defendant was facing toward Mr. Friday's house, but fired straight up into the air, not in the direction of Mr. Friday's home or in the direction of Deputy Paul's person or vehicle. There is no evidence Defendant pointed the weapon at anyone or anything when he fired it in Deputy Paul's presence. Deputy Paul was still in his vehicle and testified he did not hear or see where the bullet came down and the bullet impact did not cause him to flinch or take cover.

Additionally, Defendant and Mr. Friday lived on land composed of many acres, with Defendant living on the back five acres of the jointly owned property. The record indicates there were trees on the property and Defendant and Mr. Friday and his wife were the only residents on the property. As such, the likelihood that the bullet Defendant fired in the air would hit anyone was negligible and unlikely to cause bodily harm or death.

Therefore, we find the State did not meet the burden of proving it was foreseeable that Defendant's shot fired into the air could have resulted in death or great bodily harm as required by La.R.S. 14:94. Accordingly, the evidence was insufficient and the Defendant's conviction and sentence are reversed. Discussion of the remaining assignments of error is pretermitted.

**DECREE**

For the foregoing reasons, Defendant's conviction and sentence for illegal use of a weapon is reversed.

**REVERSED.**

-8-