DREW, J.
|!Ricky L. Brown was found guilty of attempted illegal use of a weapon, a violation of La. R.S. 14:27(D)(3) and La. R.S. 14:94(A). He was sentenced to nine months’ imprisonment at hard labor with credit for time served, consecutive to a misdemeanor sentence. He appeals. We affirm.
BRIEF OUTLINE OF SALIENT FACTS
On the late evening of September 7, 2009, Ricky L. Brown called the Tensas Sheriffs Office requesting the help of law enforcement at his club, the R & B Lounge. Three deputies were dispatched. While the deputies were en route, the dispatcher notified them of another 9-1-1 call about a man brandishing a gun at the lounge.
The deputies arrived at the lounge and briefly spoke with family members of the victims. They reported that the defendant was holding their children at gunpoint. The deputies could hear noises coming from the pier behind the lounge. The dispatcher, who had remained in constant telephone contact with the victims, informed the deputies that all involved parties were on the pier. The deputies saw the armed defendant on the pier, along with two young men further out the pier. The deputies ordered everyone to get down. All except the defendant complied. Brown dropped his firearm, but did not get on the ground. A deputy moved him away from the gun and the pier.
Following a brief investigation on the scene, deputies learned that the defendant had fired a gun at least once. Brown was arrested and initially charged with four counts of aggravated assault with a firearm, a violation of La. R.S. 14:37.4, and four counts of false imprisonment with a dangerous | ¡weapon, a violation of La. R.S. 14:46.1. Prior to trial, the defendant’s charges were amended to four counts of false imprisonment with a dangerous weapon, a violation of La. R.S. 14:46.1, and illegal use of a weapon, a violation of La. R.S. 14:94(A).
TESTIMONY
Tensas Sheriff’s Deputy Jimmy Brown testified that:
• he arrived at the club at the same time as Deputy Gillis and Major Spillman;
• family members told him that the defendant was on the pier with a gun;
*876 • he and Gillis drew their guns and ordered everyone on the pier down;
• he saw the defendant put down the gun he was holding;
• no one else had a weapon;
• two males were on the pier and two females were in a boat;
• the defendant was apparently agitated;[1]
• Spillman advised that a shot had been fired;
• the .357 revolver contained five live shells and one spent cartridge;
• when the defendant was placed under arrest, he was transported first to the hospital because of chest pains and then transported to jail;
• the victims had been drinking at the lounge;
• he had minimal contact with the victims;
• he was unable to determine when or where the weapon was fired;
• no one was struck by a bullet; and
• the spent projectile was never recovered.
| /Tensas Sheriffs Deputy Robert Stroud testified that:
• he was the supervisor of the 9-1-1 center and was on duty when the defendant called requesting law officers at the R & B Lounge;
• he knew the defendant and recognized his voice on the call;
• he dispatched three deputies to the location;
• four minutes later, another 9-1-1 call was received from April McMorris who reported that a man was holding a gun on her and her friends;
• until she called, the deputies had been unaware that a gun was involved;
• he stayed on the phone with McMorris while the deputies were en route;
• all parties could be heard arguing on the 911 recording;
• other victims took turns providing him with information while awaiting the arrival of the deputies;
• he heard the defendant curse[2] and say “back up, back up”; and
• he heard no shots fired during the 9-1-1 call.
Tensas Sheriffs Investigator Mark Guy testified that:
• he booked the defendant;
• the defendant was advised of his rights and acknowledged them in writing;
• Guy read for the jury both statements written by the defendant;[3]
*877 14* he informed the jury that he had been POST-certified;[4]
• he had been taught that officers should not fire warning shots because doing so was tantamount to random firing and could possibly cause injury; and
• random warning shots can also cause situations to escalate unnecessarily.
Tensas Sheriffs Deputy Darrell Gillis testified that:
• he responded to the R & B complaint with Brown and Spillman;
• the three lawmen arrived on the scene about the same time;
• Spillman stayed near the bar while the other two approached the pier;
• the area was dark, so they used flashlights which showed everyone;
• they announced their presence and ordered everyone to the ground;
• the two young males complied;
• the defendant did not comply, though he put his gun down;
• the defendant shouted profanities;[5]
• the defendant was handcuffed, arrested, and Mirandized;[6]
• he transported the defendant to the sheriffs office;
• the victims were not intoxicated or acting belligerently;
• he saw no one else with a gun that night; and
|s* no shots were fired while Gillis was on the scene.
Michael Hayden testified that:
• he was staying at his family’s lake house during the Labor Day weekend;
• he, his girlfriend, Laura Weeks, his cousin April McMorris, and a friend-, Tyler Durosset, were out in a boat swimming and drinking beer;
• they decided to stop by the bar to see if any of their friends were there;
• they tied up at a pier behind R & B’s;
• he knew the pier belonged to the defendant, but he did not believe it would be a problem parking there, analogizing the pier to a parking lot for cars;
• they all approached the bar, but only Laura and April went inside;
• they came back out almost immediately, followed by the defendant;
• the defendant asked for identification;
• none of the four had any ID, so the defendant said they could not enter;
• the four told the defendant that they were all over 21 and they had been to the lounge a few times so he could let them in without identification;
• one of the four told the defendant that Hayden’s father owned a business;
• “things started getting a little aggressive on that point”;
• the females began to walk toward the pier;
• the defendant asked where they were going;[7]
• he had initially told the defendant their boat was docked five piers down;
• he didn’t want the defendant to follow them back or chase them;
R* Laura, April, and Tyler walked toward the boat;
*878 • when Hayden turned to do so, the defendant grabbed his shirt;[8]
• he asked the defendant to let him go, but the defendant would not do so;
• the defendant then ran inside the lounge;
• all four of the victims ran down to the pier to get back onto the boat;
• as they arrived at the pier, they heard a gunshot;
• when they turned, they saw a flashlight;
• the four kept running down the pier;
• the females jumped into the boat;
• the two males were trying to untie the boat;
• the defendant reached the pier with a flashlight and pistol in hand;
• the defendant told the group not to leave or he would shoot them;
• he kept telling the defendant that the group only wanted to leave;
• the defendant would not allow them to do so;
• he pulled the rope from the defendant and said, “We’re gonna leave”;
• the defendant cocked the gun and aimed it at him (Hayden) and threatened to shoot;
• when Tyler approached, the defendant yelled for him to “back up, back up”;
• none of the members of his group ever touched the defendant;
• the defendant used a lot of profanity and threats;
• the shot was loud and was in close proximity to them;
• they heard a gunshot and looked back to see the defendant “right there”; and
17* he realized that the defendant was chasing them when he heard the shot.
April McMorris testified that:
• the four went out on a party barge (boat) for a night ride, drinking beer;
• they docked at the pier, which she thought was owned by the lounge;
• she and Laura were inside the lounge when Laura realized she could not bring her beer inside so she told her she needed to pour it out;
• as they moved to leave, the defendant followed them out the door;
• he asked if they had identification and none of them did;
• they attempted to explain to him that the four of them were of age and had been to the lounge before, trying to get him to let them in;
• she saw this wasn’t working, so she, Laura, and Tyler walked away;
• Hayden remained to talk with the defendant;
• she told Hayden that they didn’t want to go in that “trashy place anyway”;
• the confrontation escalated;[9]
• Hayden then said something to the defendant, who grabbed his shirt collar;
• Hayden told everyone to run, which they did;
• the defendant went into the bar as they ran toward the pier;
• they heard a loud gunshot which caused them to run faster;
• when they reached the pier, the two females jumped into the boat;
• she was digging for the keys and when she finally turned to look, she saw the defendant pulling the boat rope from Hayden and pointing a gun at him;
• Tyler was trying to untie the boat and the defendant was trying to stop him;
Is* the defendant said they would float off before they drove off;
*879 • he also told the group he would blow their heads off;
• the two females hid on the boat and called the police and family members;
• she made their first 9-1-1 call and then gave the phone to Laura;
• she was afraid for the safety of her friends and family members;
• the four of them did nothing to provoke the defendant to this extent; and
• they ran to the pier.[10]
Laura Weeks testified similarly to April McMorris, stating that:
• the group rode the boat to the pier and went to the bar;
• she saw a sign that read, “No outside drinks allowed”;
• she turned around because she had a beer in her hand;
• the defendant approached the group and asked for identification;
• she did not know the defendant, but assumed he was a lounge employee;
• they ran to the pier and heard a gunshot while they were running; and
• the defendant came to the end of the pier after the gunshot as they were untying the boat, as they were frightened and trying to leave quickly.
Thomas Weeks, Laura Weeks’ father, testified that:
• he received a call that the four were being held at gunpoint at the lounge;
• he dressed and went to the lounge along with Hayden’s father and others;
• they could not find the children in the lounge;
• Hayden’s voice was heard coming from the pier;
|s* at that time the sheriffs deputies arrived;
• the parents identified themselves and explained what they knew thus far;
• the parents drove their vehicles down a road leading to the pier;
• they then could see the children at the end of the pier;
• he heard the defendant threaten them to stay away;[11]
• he was unsure if the defendant was referring to the parents or the children;
• the deputies arrived and ordered everyone down;
• the boys complied, but the defendant did not;
• as the defendant was moved from the pier, he asked to approach the victims;
• his daughter was distraught and was crying out of control; and
• he noticed none of the victims were intoxicated.
Michael Ray Hayden, Michael Hayden’s father, testified that:
• he knew the defendant had visited the lounge on at least a few occasions;
• the defendant had given Mr. Hayden a “burn pit”;
• his wife woke him up, and they drove to the lounge;
• they could not find the group inside the lounge;
• after the deputies arrived, they all drove to the pier;
• he could see the defendant holding a gun to his son’s head;
• he saw Tyler trying to keep them separated, and
• he heard the defendant threaten the new arrivals.[12]
*880 | U)Tensas Parish Sheriff Ricky Jones testified that:
• similar incidents had taken place at the defendant’s lounge over the years;
• on April 28, 2006, the defendant sprayed Mace on a brother and sister following an argument about beer being placed on a pool table;
• as they left, the couple was sprayed with Mace;
• the sister was kicked as she was walking out of the door; and
• the defendant was arrested for two felonies, but pled to two misdemeanors.
Tensas Deputy Earnest Spillman testified that he spoke with all of the witnesses but he did not write a written report or make any notes.
Emily Mae Brown, the defendant’s great niece, testified that:
• she was working as a bartender at the lounge on the night of the incident;
• he saw three or four “kids” walk into the lounge and stand around;
• one or two came in with drinks, which was prohibited by lounge policy;
• she saw the defendant walk the group outside;
• she noted that he returned and got a telephone to call the police;
• individuals often arrived at the lounge by boat and docked at the pier; and
• she did not hear the gunshot that night, as she was inside.
The defendant testified that:
• his business, home, and pier are all located in close proximity;
• he did not allow bar patrons to use the pier on a regular basis, due to his fear ^hat an intoxicated person would fall off Pier and drown;
* previously been convicted of a misdemeanor;
• he had an innocent version of the incident described by the sheriff;
In* the victims arrived 15 minutes before the bar was due to close at midnight;
• his attention was drawn to the girls because they had beer in their hands;
• he asked for their identification and asked them to discard the beer bottles;
• none had identification, and they looked underage to him;
• after discarding the bottles, the four left the bar;
• he followed them outside and asked how they had arrived;
• they replied they had parked five piers down;
• Hayden said his father told him he could come to the lounge;[13]
• the group was polite at this point;
• Tyler told him he had been in the lounge on a prior occasion;
• he replied that with no proof of age, they could not enter;
• Hayden then threatened him;[14]
• he asked them to leave, but they started walking off toward his house;
• the group started talking louder and cursing;
• when he asked one of the girls where they were going, she cursed him;[15]
• he told them he was calling the sheriff;
*881 • Hayden tried to knock the phone out of his hand and then ran away;
• they ran toward his house so he went inside and got a light as well as his gun because he was uncertain what might happen as he chased the group;
112* he kept money and equipment in his shed;
• he didn’t know whether they were armed;
• when he got to his house, he could see the pier at this point and the individuals were kicking his rod reels and tackle boxes into the water;
• he hollered at them to stop what they were doing;
• when they did not stop, he fired his gun into the air;
• three of the group jumped into the boat, leaving Tyler on the pier;
• he grabbed and held the rope, telling them to calm down because the sheriffs department was on the way;
• he and the young people continued jawing;
• he believed he was protecting his property, protecting his body and if he didn’t have the gun, he would have been whipped on the pier;
• he shot into the air, not over the water or in the group’s direction;
• he fired only after he “hollered” at the group to stop and they did not do so;
• he kept saying “back up, back up” on the 9-1-1 recording, because Tyler kept advancing toward him and he was unsure of his intentions; and
• $500 worth of his property had been kicked off the pier into the water.
DISPOSITION
The jury found the defendant not guilty of all four counts of false imprisonment, but guilty of the responsive verdict of attempted illegal discharge of a weapon, with a total exposure of one year at hard labor. He was sentenced to nine months at hard labor, consecutive to a misdemean- or sentence.
J^DISCUSSION

Sufficiency

The defendant claims the state failed to present sufficient evidence to support a conviction of attempted discharge of a dangerous weapon in that the state failed to prove that the “shot” fired by the defendant could have resulted in death or great bodily harm. The state counters that sufficient evidence was presented for the jury to find that the shot fired by the defendant could have resulted in death or great bodily harm as required to support a conviction for illegal use of a weapon.
Our law on sufficiency is well settled.[16]
*882 | ^Illegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent[17] discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being. La. R.S. 14:94(A).
In order to prove illegal use of weapons, the state must prove beyond a reasonable doubt that the defendant (1) intentionally or in a criminally negligent manner discharged a firearm, and (2) that he did so when it was foreseeable that death or great bodily harm to a person might result. State v. Davillier, 46,625 (La.App.2d Cir.11/2/11), 83 So.3d 22.
Our law on the analysis of an attempt is clear.[18]
During the trial of the matter the state presented sufficient evidence for the jury to find that the defendant (1) intentionally discharged a firearm, 11sand (2) that he did so when it was foreseeable that death or great bodily harm to a person might result. The state’s witnesses testified that they were attempting to leave the defendant’s lounge after they were unable to get *883 in and following an argument with the defendant. While running through a dark area between the defendant’s lounge and the pier where their boat was docked, they heard a shot, then shortly after, the defendant was behind them demanding they not leave the area.
The defendant’s testimony during the trial was itself sufficient to establish the essential elements of the offense.[19]
The defendant’s case is distinguishable from State v. Cain, 2009-390 (La.App.3d Cir.11/4/09), 21 So.3d 1104.[20]
| )(iWhile the defendant contends he fired straight into the air, there were others in the vicinity at the time the shot was fired, at minimum, the four individuals he was chasing down the pier. Considering that many individuals were patrons at the lounge that night, it would have been foreseeable that any one of them could have been along the path toward the parking lot behind the lounge at the time the shot was fired. Additionally, all of the victims who testified indicated they heard the shot being fired and reacted to it because they were frightened by the sound of the gunshot and it caused them to run faster toward the boat. Further, the defendant fired the shot during the night in a dimly lit area. See also, State v. Matthews, 2010-1507 (La.App.4th Cir.6/15/11), 70 So.3d 116.
The jury reasonably concluded that the state presented sufficient evidence to meet its burden of proving the defendant illegally discharged his weapon.

Review of Sentence

The defendant argues that the trial court erred in imposing an excessive sentence and that the trial court failed to articulate adequate reasons for justifying the sentence. He urges that a lesser sentence would be more appropriate, considering his background and the instant circumstances.
The state responds that the trial judge adequately considered the guidelines in particularizing the sentence for this defen *884 dant and this sentence is not excessive considering his increasingly violent and dangerous responses to the patrons at his bar.
117Our law on the review of sentences is well settled.[21]
The applicable penalty provision of La. R.S. 14:94 provides:
B. Except as provided in Subsection E, whoever commits the crime of illegal use of weapons or dangerous instrumentalities shall be fined not more than one thousand dollars, or imprisoned with or without hard labor for not more than two years, or both.
11RThe applicable penalty provision of La. R.S. 14:27(D) provides:
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.
*885 According to the defendant, the trial court failed to consider his health, his work history, his family obligations, or his other personal circumstances. He urges that the trial court’s analysis of this event, and previous altercations, was flawed.
We disagree. During the sentencing hearing, the trial judge exhaustively detailed the reasons for imposing this sentencing, including:
• that a presentence investigation revealed prior misdemeanor convictions;
• that the court presided over the trial of the defendant’s prior misdemeanor convictions, for which he received a suspended sentence;
• the precise analysis of the factors listed in La. C. Cr. P. art. 894.1;
• that there were no mitigating factors present and no justification for the defendant’s actions;
• that his previous misdemeanor convictions and this offense were all committed against his bar patrons, with the level of violence increasing;[22]
• that the court did not feel that the defendant would respond affirmatively to another term of probation;
• that the defendant lacked remorse;[23] and
• that, at trial, the defendant denied his guilt in the prior convictions.
| mThe defendant admits that he did not receive the maximum sentence. Based on the record before this court, it is clear that the trial court carefully considered the appropriate factors in determining a proper sentence. There is nothing here to indicate that the trial court failed to consider any special circumstances or issues surrounding his health, work history, family obligations, or other personal circumstances. The defendant does not favor us with what factors were ignored by the trial court. Without more, it cannot be said that the information contained in the pre-sentence investigation report was insufficient. There is nothing about this sentence that shocks the sense of justice. Considering the defendant’s actions on that night against the unarmed individuals, a one-year maximum sentence would not have been excessive. This nine-month sentence is appropriate.
DECREE
The defendant’s conviction and sentence are AFFIRMED.

. The defendant blurted out: "I’m not getting down on my own damn property. These m* * * *r — f* * * * *s are trespassing.”

. "Don’t pull the rope out of my hand,
[[Image here]]

. Gist of defendant’s first written statement was that the victims came to his bar without identification and he asked them to leave. They indicated they were "Haydens” and the defendant was making a big mistake. The group told the defendant their boat was about five piers down at a friend’s pier. The Hayden boy started to get smart and the group threatened him. He called the law and when he came out the group ran to his pier. He chased them to the pier. They were telling him there was nothing he could do to them and they threatened him again. The "yanker rope” was pulled out of his hand and he asked the group to wait until a deputy arrived. The group was on his property without his permission.
Gist of defendant’s second written statement was that the defendant asked to speak with the Sheriff and “they” refused to call him. He asked for his medication, but the request was refused. He had heart problems and was having chest pains. He was arrested and handcuffed on his own property and the judge was refusing to release him from jail the next day. The judge was the same judge who filed charges on him before, when his "kin was involved.” He had rights and they were being ignored.

. "POST” is an acronym for Peace Officer Standards and Training, the agency responsible for law officer certification in Louisiana.

. "Damn it. I'm not getting off my pier. This is my m* * * *r — P * * * *g pier. These m* * * *r — P * * * *s are trespassing.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

- One of the females responded, "none of your m* * * *r — IP * * * *g business.”

. This detail is omitted in his statement on the night of the incident.

. The defendant exclaimed: “Wait a minute— Where's that bitch going?”

. Her initial statement indicated that they walked, but at trial she insisted they ran.

. "The first m* * * *r — f* * * *r that steps foot on this pier, I'll kill him.”

."The first m* * * *r — f* **'r that steps on my dock, I’ll kill you.”

.The defendant thought the young man was saying "Haddad” and not Hayden. "Had-dad” was not a familiar name to the defendant.

. Tyler allegedly said: "You know, you need to have your ass whipped.”

. "Ain’t none of your m*** *r — P * * * *g business.”

. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or *882 in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.3/7/08), 977 So.2d 896. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La. 11/9/06), 941 So.2d 35.

. Proving an attempt requires proof of specific intent to commit a certain crime. Proof of only criminal negligence would not be sufficient to sustain this conviction.

. La. R.S. 14:27 provides in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended. Attempt requires both the specific intent to
commit a crime and an act for the purpose of, or an "overt act," tending directly toward accomplishment of that crime. State v. Prine, 44,229 (La.App.2d Cir.5/20/09), 13 So.3d 758, writ denied, 2009-1361 (La.2/5/10), 27 So.3d 298. Specific intent to commit a crime is an element of an attempted offense. The state has the burden of proving the defendant’s specific intent to commit the charged crime. Id. Conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the prescribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. Id. The determination of whether the requisite intent is present is for the trier of fact. State v. Hill, supra.

. The defendant testified he was turning the corner of his house and he was able to see the group of victims on his pier. He shouted for them to stop; however, when they did not heed his call or demand, he chose to fire his weapon into the air. It is certainly foreseeable that death or great bodily injury could have occurred to one of those individuals on the pier by the discharge of the weapon. Apparently, the defendant must have been within shouting distance for the group to hear him. It is definitely foreseeable that a randomly fired errant bullet could also travel that distance as well. The defendant’s argument is basically that he fired the warning shot to stop the group; however, he also wishes it to be believed that the group could not have possibly been in any danger of receiving any injury from the discharge of the weapon. It was certainly reasonable for the jury to reject the defendant’s contentions. Considering the fact that he was chasing four individuals and that he was a short distance from his lounge and his house, it was definitely foreseeable that death or great bodily harm to a person might have resulted from the discharge of the defendant’s weapon.

. In Cain, the Third Circuit reversed a conviction for illegal use of a weapon after finding that it was not foreseeable that a shot fired into the air by the defendant could have resulted in death or great bodily harm so as to support conviction when the evidence showed that there was no one else in the area other than an officer who was investigating a complaint. The officer testified that the defendant fired straight up into air, not in the direction of the complainant's home or officer's person or vehicle. The shot was fired while the officer was still in his vehicle and the officer testified he did not hear or see where the bullet came down and the bullet impact did not cause him to flinch or take cover. Additional factors considered were the fact that the defendant and the complainant lived on land comprising many acres, with defendant living on the back five acres with numerous trees. Additionally, the defendant and his wife were the only residents on the property.

. The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.9/28/07), 964 So.2d 351.
In selecting a proper sentence, a trial judge is not limited to considering only a defendant’s prior convictions but may properly review all prior criminal activity. State v. Pamilton, 43,112 (La.App.2d Cir.3/19/08), 979 So.2d 648, writ denied, 2008-1381 (La.2/13/09), 999 So.2d 1145; State v. Boyte, 42,763 (La.App.2d Cir. 12/19/07), 973 So.2d 900, writ denied, 2008-0175 (La.6/20/08), 983 So.2d 1272. The sources of information relied upon by the sentencing court may include evidence usually excluded from the courtroom at the trial of guilt or innocence, e.g., hearsay and arrests, as well as conviction records. State v. Myles, 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses. State v. Doyle, 43,438 (La.App.2d Cir.8/13/08), 989 So.2d 864.
A defendant’s lack of remorse is a proper sentencing consideration. State v. Birch, 43,119 (La.App.2d Cir.3/19/08), 979 So.2d 643; State v. Robinson, 33,921 (La.App.2d Cir. 11/01/00), 770 So.2d 868; State v. Shipp, 30,562 (La.App.2d Cir.4/8/98), 712 So.2d 230, writ denied, 98-1199 (La.9/25/98), 724 So.2d 775.
Second, a sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.

. "[fjrom fist to Mace and now to firearms.”

. The defendant told his probation officer that he had been falsely accused.